**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| JAMIE REED,<br>*Plaintiff*,<br>v.<br>THE WASHINGTON UNIVERSITY,<br>*Defendant*. | Case No.<br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Jamie Reed, through the undersigned counsel, files this Complaint for damages and equitable relief against Defendant The Washington University.

**INTRODUCTION**

1. Plaintiff Jamie Reed ("Jamie") has dedicated her life to helping others, with a particular focus on LGBT youth. That commitment to serving the most vulnerable led her to work for Defendant, first as a case manager assisting gender dysphoric (i.e. transgender) and HIV-infected patients, and later as a case manager for Defendant's Pediatric Transgender Center at St. Louis Children's Hospital ("the Center"). While working at the Center, Jamie was confronted with a pattern of unethical medical practices that she observed actively harming her LGBT patients, as well as billing practices that were plainly fraudulent. For example, the Center's providers (1) neglected to conduct mental-health evaluations or provide psychological

treatment before embarking children on a high-risk course of puberty blockers and opposite-sex hormones; (2) misled and pressured parents through manipulative tactics to consent to such treatment; and (3) falsified insurance claims by concealing the cosmetic or sex-trait-modifying nature of the intervention to avoid warranted denial of coverage.

2. Jamie repeatedly, and with increasing urgency, raised her concerns to Defendant and its management. Her well-founded complaints were ignored, and she was instead met with hostility and reprisal. She was instructed, in no uncertain terms, to shut up and follow orders and her performance evaluations sharply declined without explanation. Having been rebuked internally and left with no other options, Jamie became a whistleblower and reported Defendant's insurance fraud to the Missouri Attorney General. Instead of self-correcting in the face of a formal investigation into conduct that defrauded public and private insurers and harmed children, Defendant doubled down. Defendant, its senior officials, and its employees retaliated against Jamie with a sustained harassment campaign that escalated until she had no choice but to resign her employment with Defendant. Through this action, Jamie seeks to hold Defendant accountable for retaliating against the one person willing to tell the truth to and about Defendant.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Jamie's claim arises under the laws of the United States. This Court has supplemental jurisdiction over Jamie's state law

claims under 28 U.S.C. § 1367. This court has jurisdiction over the Fourth Claim for Relief, Jamie's ERISA claim under 29 U.S.C. § 1132(e)(1) and (f).

4. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) and (b)(2) because Defendant resides in this District; because a substantial part of the events or omissions giving rise to Jamie's claim occurred in this District; and because Jamie was employed by Defendant in this District. Venue over Jamie's ERISA claim (defined below) is also proper under 29 U.S.C. § 1132(e)(2) because the employer-sponsored group health plan (" the Plan") is administered in this District, the breach took place in this District, and Defendant resides and may be found in this District.

5. Jamie brings this action under the anti-retaliation provision of the federal False Claims Act, 31 U.S.C. § 3730(h); the Missouri Health Care Fraud and Payment Abuse Act, Mo. Rev. Stat. §§ 191.900–.910; and the Missouri Whistleblower's Protection Act, Mo. Rev. Stat. § 285.575. Jamie also brings a claim under the continuation-coverage provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. §§ 1132(a)(1)(A), (c)(1), 1161-1168.

**PARTIES**

6. Jamie is a citizen and resident of the State of Missouri.

7. Defendant is a private university incorporated under the laws of the State of Missouri with its principal place of business in St. Louis, Missouri. Accordingly, Defendant is a citizen of Missouri.

## FACTUAL ALLEGATIONS

***Jamie's Education and Work Experience***

8. Jamie received a Bachelor's degree in cultural anthropology from the University of Missouri-St. Louis and a Master of Science degree in clinical research management from the Washington University School of Medicine.

9. Jamie has extensive work experience in social service organizations, in particular those organizations that serve LGBT youth. Jamie was drawn to working with this cohort due to her own background. Jamie is a lesbian who was a tomboy growing up and who married a transgender man (a woman who identified as a man). She believes that she and these youth are part of the same community and hoped her experiences could be of some benefit to LGBT children and teenagers dealing with gender-related distress.

10. In addition, Jamie has worked with developmentally disabled adults in a residential facility and served as the clinical and case manager for Planned Parenthood of North Central Florida.

11. In November 2015, Jamie was hired by Defendant as a case manager for HIV-positive transgender patients. Her job responsibilities included assisting these patients with name and sex changes of various official or government documents, obtaining employment and housing, and securing restroom access consistent with their expressed gender identity. Through this experience, Jamie learned about various sex-trait modification "medical" procedures Defendant offered to transgender patients.

12. In 2017, Defendant, in collaboration with the St. Louis Children's Hospital, opened the Center under the executive supervision of Dr. Christopher Lewis and Dr. Sarah Garwood. The Center was established to offer sex-rejecting (or—per the Center's preferred euphemism—"gender-affirming"[1]) procedures to children.

13. In July 2018, Jamie, with the encouragement of Defendant's administrators, applied for and was hired as a case manager for the newly established Center, a position she held for over four years. In her new role, Jamie completed new-patient intakes and met with both new and existing patients two to three days per week to assist in planning and managing their care. Jamie worked as part of a team made up of doctors, nurses, and social workers who met regularly to discuss patient medication and procedures. She was responsible for training new members of the care team, including doctors.

14. Jamie was also responsible for training local pediatricians on transgender interventions, which often involved recommending that the doctor ask the child for their gender identity. Should the child's gender identity not conform to their sex, Jamie would advise local pediatricians to refer the child to the Center.

---

[1] The "gender-affirming care" model began with Dutch researchers who sought to medically "transition" the sex of gender dysphoric adolescents before those adolescents reached adulthood. The motivating idea was that if medical intervention began at the beginning of puberty through use of gonadotropin-releasing hormone (GnRH) agonists to arrest normal puberty (so-called "puberty blockers") and then cross-sex hormones (testosterone for natal females, estrogen for natal males), the patient could have a physical appearance more congruent with the patient's gender identity than if the patient went through puberty (and had a sex change operation afterward), and subsequent surgery to further align physical appearance with gender identity would be more successful. Studies have since demonstrated that this approach is not evidence-based nor effective nor best-practice.

15. Most of the Center's staff identified as LGBT or had a close relative who identified as transgender. For example, the founding director, Dr. Christopher Lewis, was a homosexual male; another prominent physician, Dr. Sharon Vermont, had a child who transitioned; and the psychiatrist, Dr. Andrea Mari Giedinghagen, was a homosexual female. The Center prioritized the hiring of LGBT staff. While participating in the hiring committee for an "educational liaison," Jamie observed that the Center would not consider any candidate who did not identify as transgender.

16. When Jamie began working at the Center, Defendant told her that it expected to treat only about 50 patients in total. Patient volume soon exceeded that projection. On June 4, 2021, Jamie emailed Dr. Garwood, Dr. Lewis, Karen Hamon, Samati Niyomchai, and Kimberly Donica that the Center had received 47 new intakes in May and that the monthly trend continued upward. On December 1, 2021, she emailed Niyomchai, Beth Mora, and Hamon that she had received 18 intakes over five recent workdays and warned that "this pace would be difficult to sustain if it continues." By the end of Jamie's employment at the Center, it had served more than 1,500 unique patients.

17. The Center touted itself as a multidisciplinary specialty unit created to provide full service medical intervention to transgender youth. As advertised, the unit housed four sub-specialties: endocrinology, adolescent medicine, psychology, and psychiatry.

18. In practice, however, transgender youth did not receive the extensive psychological services they were supposed to undergo before beginning any gender intervention. Rather, Jamie was required by Defendant to schedule patients immediately upon intake with endocrinology or adolescent medicine providers, who would prescribe puberty blockers and/or opposite-sex hormones before any psychological workup or care had even been attempted or offered. When Dr. Lewis implanted puberty blockers, he booked a surgical suite for the procedure, which let Endocrinology bill insurance companies at a higher rate.

19. The dearth of psychiatric and psychological services provided was particularly startling because nearly all children who sought treatment at the Center presented with serious comorbidities, including autism, ADHD, depression, anxiety, PTSD, trauma histories, OCD, and serious eating disorders.

20. Jamie knew further that leapfrogging psychological and psychiatric assessments was out of step with even the treatment guidelines of the World Professional Association for Transgender Health ("WPATH"), the most ideologically partisan of "gender-affirming" pseudo-medical organizations. At the time, even WPATH recommended mental health assessments on a minor patient before prescribing puberty blockers and opposite-sex hormones to those patients.

21. Jamie also witnessed the Center's providers misleading patients' parents about treatment options and pressuring them to provide the required consent to medical interventions for their children on numerous occasions. These tactics included, but were not limited to, nurses and doctors falsely suggesting to parents

that their child would self-harm if the interventions were not approved, barring non-affirming parents from attending appointments, falsely stating that puberty blockers were "fully reversible," misrepresenting the side effects and dangers and assisting pro-transition parents in securing the representation of a family law attorney.

22. At the time, prevailing standards of care required a letter of support from a licensed mental-health provider before a minor could begin puberty blockers or opposite-sex hormones. But the Center distributed a fill-in-the-blank template to outside therapists that supplied only one proposed conclusion—that the patient was approved to proceed—and did not give the therapist an option to recommend against medical intervention or to recommend further therapy first. Jamie and community therapist Kelly Storck, LCSW, developed the template; Dr. Lewis and Dr. Garwood reviewed and approved it; and Jamie distributed it from her Washington University email account. As Jamie later explained in her sworn whistleblower statement, "[w]e would tell the therapists what to write and even had a fill-in-the-blank template."

23. When Ms. Hamon raised these compliance concerns with Dr. Lewis, he responded that the clinic had "no legal or ethical obligation" to conform to clinical guidelines or meet the standard of care for its patients.

24. Between 2018 and 2022, Jamie witnessed various doctors at the Center provide sex-rejecting procedures to patients covered by private insurance, Missouri Medicaid managed care and fee-for-service minor patients, Illinois Medicaid managed care minor patients, and TRICARE Prime and Select minor patients. Such care included ordering various laboratory tests, inserting puberty blockers,

prescribing cross-sex hormones and referring them for sex-trait change surgeries. The sole purpose of these interventions was cosmetic: seeking to alter the appearance of the patient to more resemble that of the opposite sex. Defendant submitted and obtained reimbursement for these patient visits, laboratory tests, puberty blocker administrations, hormonal and cross-sex hormone treatments and surgeries from these insurers.

25. Defendant knew that Medicaid, TRICARE, and various private insurers did not cover purely cosmetic, sex-trait-modifying interventions. Defendant nonetheless routinely billed such insurers for these procedures, submitting false or inaccurate diagnosis codes where necessary to make the procedures appear medically necessary and non-cosmetic. Center staff also raised concerns about the diagnosis codes used to obtain coverage. On October 10, 2022, for example, Clinical Nurse Coordinator Karen Hamon wrote Jamie: "I honestly don't know if the code applies or not but I want the approval from providers before I add shit like that because it's insurance fraud to add inappropriate codes."

26. Drs. Lewis and Vermont nevertheless directed that the false codes be submitted. Many of the recurring billing errors affecting Center patients originated with the billing specialist assigned to the Endocrinology department; those errors were tolerated, and where they produced outcomes favorable to the treatment approvals Dr. Lewis wanted, they were left uncorrected.

27. Jamie also witnessed doctors at the Center prescribe medications that they knew or should have known were unsafe and had no proven basis for use. For

example, doctors routinely prescribed bicalutamide to block the effects of testosterone in natal males. Bicalutamide is FDA-approved solely for prostate cancer. It has the potential to cause severe liver toxicity. No standards of care exist or have existed for its use in cross-sex hormone therapy. Indeed, even WPATH SOC 8 states: "[g]iven that bicalutamide has not been adequately studied in trans feminine populations, we do not recommend its routine use."

28. Jamie repeatedly discussed with other Center staff her discomfort with how the Center coded the claims it submitted to insurers, including the federally and state-funded programs such as Missouri's Medicaid program. Jamie was never personally directed to submit a false claim. But, on a Wednesday clinic day at the Center's main St. Louis Children's Hospital site, she discovered that a puberty blocker had been approved for implantation based on a false billing entry—a precocious-puberty diagnosis that did not apply to the patient. Although the error was identified, the implantation proceeded anyway and the billing record was never corrected, despite a nurse having informed Dr. Lewis of the error. This was not an isolated act but part of a pattern in which billing irregularities affecting Center patients were selectively ignored or ratified when they produced clinically convenient results, with physician-level knowledge and no corrective action. Many of the children for whom the Center billed were neither experiencing precocious puberty nor diagnosed with, nor meeting the criteria for, gender dysphoria. Throughout 2021 and 2022, these practices were the subject of detailed and significant internal debate. Jamie and others—including the Center's own psychologists—understood that a

recognized DSM[2] diagnosis should precede treatment and billing; Dr. Lewis rejected that premise. He was the primary driver of the practice of billing under unspecified endocrine conditions, placing him in conflict with both standard billing practice and the clinical judgment of his own staff. He used such practices to obtain payment for interventions that were not medically justified and would otherwise have been denied.

29. The Center's diagnosis coding was also driven by some families' wish to conceal their child's transgender status. Under Missouri law at the time, the sex marker on a birth certificate could be amended either upon a showing of sex reassignment surgery or through a correction form. As part of her duties, Jamie kept the correction form on hand at the Center and assisted parents in completing it when they wanted their child to live "stealth," that is as the opposite sex without anyone at the school or elsewhere knowing. To serve that same goal, the Center did not bill these children's care under the F64 gender dysphoria codes. Instead, it billed under the other diagnosis codes so that a gender dysphoria diagnosis would not follow the child through his or her insurance records. As such, the diagnosis codes submitted to insurers did not reflect the actual basis of the treatment provided.

30. Other parents, often working through attorneys, sought to amend their children's birth certificates through the surgical route. They asked the Center to

[2] DSM is the Diagnostic and Statistical Manual of Mental Disorders. Published by the American Psychiatric Association, it is the standard classification and reference handbook used by mental health professionals in the U.S. and globally to diagnose psychiatric conditions.

attest that their children had undergone "sex reassignment surgery." They contended that implanting a puberty blocker qualified as surgery, and that even a testosterone injection qualified because the needle penetrated the skin. These requests usually came to Jamie first, and she brought them to the Center's physicians for signature. Jamie and another nurse regarded the requests as plainly baseless and said so. The physicians, however, were usually willing to sign. This placed Jamie and other staff under further pressure to participate in conduct they believed to be fraudulent.

***Jamie Takes Her Concerns to Defendant and is Retaliated Against***

31. During this time, Jamie repeatedly raised these concerns through the Center's ordinary channels. Her written communications identified the rapid pace of new intakes, the limited mental-health assessment preceding letters of support, specific high-risk patient cases, and frontline staff's concerns about medical transition of minors.

32. On March 6, 2021, Jamie emailed Dr. Lewis, Dr. Garwood, Hamon, and Niyomchai that the Center's own psychologists generally held only two sessions before issuing a letter of support. On February 2, 2022, Jamie emailed Niyomchai under the subject line "Protocal?" (*sic*) and attached a written account of a patient with a substantial history of psychosis and schizoaffective disorder who had been started on testosterone. Jamie asked whether Niyomchai would present the concern to the Center's co-directors, consistent with the process she understood management had established.

33. Jamie had also raised specific custody and consent concerns. On June 23, 2021, she told Dr. Lewis, Dr. Garwood and Niyomchai that a court order had placed the decision whether to medically transition a child under sixteen "in our hands," which Jamie regarded as a serious consent concern. On July 28, 2021, she told Dr. Lewis, Dr. Garwood, Niyomchai, Hamon and other team members that the Center lacked a clear and consistent custody policy, that custody documents were rarely provided and that reported custody arrangements sometimes did not match the child's legal status. Jamie urged the Center to obtain custody documents and documented consent from all legal guardians before scheduling non-emergency care.

34. In late 2021 and early 2022, Jamie continued to report patient-specific concerns in writing. On November 28, 2021, Dr. Lewis told the Center team that anyone concerned about its care should "speak up" with "patient specific details or exact situations." On November 29 and 30, 2021, Jamie responded to Dr. Lewis, Dr. Garwood, Niyomchai and Hamon—and, on the second report, Dr. Giedinghagen—with two detailed high-risk cases. In one, Jamie advised against an endocrine referral pending trauma therapy. In the other, she documented significant cognitive, psychiatric, and safety concerns. On January 6, 2022, Jamie told Niyomchai that she did not "ethically agree" with referring a minor to a "gender-affirming" therapist without first discussing that approach with the parent and obtaining the parent's agreement.

35. On October 6, 2022, Jamie emailed Dr. Lewis, Dr. Garwood, Hamon, Adolescent Medicine Division Chief Katie Plax and Endocrinology Division Chief Ana

Maria Arbeláez. Jamie reported that educated frontline medical staff were expressing increasing concern about medical transition of minors, including treatment of children presenting to the emergency department with significant mental-health and behavioral conditions and that gaps in policy remained unaddressed.

36. Rather than address these concerns, Center leadership took affirmative steps to suppress them. Between 2021 and 2022, during a clinic day at the St. Louis Children's Hospital West County Specialty Center, Dr. Lewis personally directed Jamie—using EPIC, the electronic medical record system—that she was no longer permitted to tag to a patient's chart any clinical note reflecting concern about that patient. Dr. Lewis showed her how to send messages to physicians without making them part of the traceable medical record. The purpose and effect were to render Jamie's clinical observations and concerns untraceable to individual patient records. During the same period, staff were expressly prohibited from using the word "concerns" when communicating with the Center's physicians.

37. During her final two years at the Center, Jamie shared an office with Clinical Nurse Coordinator Karen Hamon and was present when Ms. Hamon took patient calls. On one occasion, a biological female patient taking testosterone called to report significant bleeding. Believing the bleeding was menstrual, Ms. Hamon told the patient to use a heavy pad and call back if she bled through it within an hour. The patient called back, stating she had bled through the pad, her underwear, her jeans, and her blanket and onto her mattress. Recognizing a medical emergency, Ms. Hamon sent the patient to the emergency room, where she required surgical repair

of her vaginal canal. The injury was caused by the effects of testosterone on vaginal tissue.

38. Jamie assessed that the incident met the criteria for an adverse event and located the University's process for reporting it. Jamie and Ms. Hamon told Dr. Garwood and Dr. Lewis that they believed the incident had to be reported. Dr. Lewis then came to the office Jamie and Ms. Hamon shared (a small, windowless room with a single door) and stood in the doorway, blocking the only exit. He screamed at Jamie that she was wrong and that she would not be allowed to report the incident as an adverse event. He insisted that the injury was a known effect of testosterone and told Jamie she was not smart enough to understand what an adverse event is. He continued to yell at Jamie, and physically prevent her from leaving the room for over 10 minutes until she agreed not to file the report. Jamie was left shaking and afraid after being confined against her will in the office, berated, and prevented from filing a report she believed patient safety required.

39. The retaliation also took the form of formal discipline. Although every one of Jamie's annual performance reviews dating back to the 2015–2016 review period had carried an overall rating of 2.0 ("Achieves Expectations") or higher, the review covering the period May 1, 2020, through April 30, 2021, gave her an overall rating of 1.8—below "Achieves Expectations." The stated basis was not any clinical deficiency, operational failure, or mistreatment of patients. Rather, it was Jamie's "communication style"—specifically, copying the Center's co-directors on emails that raised concerns about patient care and billing practices and expressing uncertainty

about the Center's clinical practices in front of social-work trainees. In other words, the conduct cited as deficient was Jamie's act of raising concerns through institutional channels. A verbal warning documented in a disciplinary email from Program Manager Samati Niyomchai followed on February 7, 2022.

40. Under Washington University's written, university-wide human-resources policy, an employee must remain in her position for at least nine months and be in "good standing"—defined as the absence of any corrective action within the preceding nine months—before becoming eligible for an internal transfer. Because the February 7, 2022 verbal warning and the negative performance review constituted "corrective action" under that policy, they had the effect of locking Jamie in place at the Center for a year, foreclosing her ability to leave the very environment in which she was being retaliated against.

41. Matters came to a head at a Center staff retreat in the late summer of 2022, attended by Dr. Lewis, Dr. Garwood, Karen Hamon, Anne Giedinghagen, Casey Lofquest, Alex Maixner and Jamie. After team-building activities and lunch, the afternoon session devolved into a heated confrontation between Dr. Lewis and Dr. Garwood, on one side, and Ms. Hamon and Jamie on the other, over patient care, ethics, and the team's longstanding concerns about the absence of adequate safeguarding and the pattern of rapid medicalization of minors without sufficient clinical assessment. Jamie and Ms. Hamon were told that it was "not acceptable to even use the word 'concerns' any longer to the doctors regarding the care," and that they needed to "get on board or get out." The directives issued at and around this

meeting were unambiguous: any questioning of Dr. Lewis would no longer be tolerated. The fact that Dr. Lewis was the prescriber was declared sufficient to end any clinical discussion—and staff were to stop challenging him, even where his practice fell outside any recognized safeguarding standard or clinical guideline.

42. In November 2022, once the one-year transfer restriction expired, Jamie transferred from the Center to Defendant's Division of Pediatric Hematology and Oncology. Jamie's single position at the Center was ultimately filled by three separate employees—two case managers and a clinical research coordinator—each of whom Jamie was asked to train.

43. In her new role, Jamie served as a Clinical Research Coordinator II, supervised by Sally Jones. She assisted physician-investigators in coordinating multiple complex clinical research studies simultaneously; served as the liaison among the research team, sponsoring agencies and study participants; managed and documented all phases of study protocol to ensure regulatory compliance; coordinated participant recruitment, screening, enrollment and follow-up; completed case report forms and source documentation; and maintained accurate clinical research files. That research had nothing to do with transgender care.

44. In a further effort to prompt internal action, Jamie turned to Dr. Abigail Barker, a Research Assistant Professor at Washington University's Center for Health Economics and Policy, who had independently followed developments in pediatric gender medicine and had personal knowledge of the Center's practices—having declined to enroll her own child after concluding the program was not clinically safe.

On February 11, 2023, Dr. Barker wrote directly to Washington University Chancellor Andrew Martin regarding the Center, offering to connect the University's investigative team with more than a dozen international clinicians and researchers. Through this credentialed faculty intermediary, through years of formal HR documentation, and through sustained internal escalation, Defendant was on notice of Jamie's reports of unethical and illegal conduct at the Center. It chose not to act.

***Jamie Files a Complaint with the Missouri Attorney General and is Retaliated Against***

45. On January 26, 2023, Jamie emailed a letter to the Missouri Attorney General, which set forth a "formal complaint concerning questionable medical practices and treatment of minors by the Center." Exhibit 1. Jamie's letter included:

> the rapid medicalization of children; poor assessments of mental health concerns prior to provision of gender altering treatment; medicalization of children without prior and adequate therapeutic treatment; lack of appropriate, informed written consent of parents and youth; and actual, permanent and irreversible harm and injury caused by the medical treatment provided at the Center.

46. On February 7, 2023, Jamie provided a sworn affidavit to the Missouri Attorney General, setting forth her observations regarding potential ethical and legal violations by the Center. Exhibit 2. Among her observations was that the Center was submitting false and/or unnecessary claims to publicly funded insurance companies with respect to the coverage of puberty blockers and opposite-sex hormones for minor patients. She also swore that she had personally witnessed staff say they were uncomfortable with how the Center told them to code bills sent to publicly funded insurance programs and that providers dismissed requests for billing clarification

and prioritized obtaining coverage for procedures that would otherwise not be approved.

47. Based on Jamie's report, the Missouri Attorney General's Office launched a multi-agency investigation of the Center for fraudulent and unnecessary insurance billing and violations of Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.020, *et seq*. Exhibit 3.

48. On February 9, 2023, Defendant, Jamie's managers, and her co-workers learned that Jamie had reported the Center's practices to the Missouri Attorney General. Jamie's managers told her they were aware of her whistleblowing activity as word spread quickly throughout the organization, leaving no uncertainty as to who had made the report. The message was clear: Jamie publicly exposed and criticized the Center's operations, and she would pay for it.

49. Defendant's faculty immediately attacked Jamie using Defendant's own platforms. On February 23, 2023, Dr. Jeremy T. Goldbach, a chaired professor at Defendant's Brown School, and Dr. Shannon L. Dunlap published a piece on Defendant's official Clark-Fox Policy Institute website titled "Trans Kids Don't Need a Savior, They Need Access to Evidence-Based Care." The piece attacked Jamie's credibility and professional standing, falsely describing her as an "intake coordinator with no specialized training" and comparing her to "the front-desk worker at an emergency room."

50. Dr. Goldbach had firsthand reason to know that characterization was inaccurate. He had worked directly with Jamie on a clinical-research workflow and,

eight months earlier, praised her work in writing. Instead, he chose to attack her for her whistleblower activity.

51. At 5:23 p.m. on February 23, 2023, Dr. Goldbach emailed a PDF of the piece under the subject line "Response to WUSTL Trans Clinic 'Whistle blower'" to four Brown School faculty distribution lists, including the tenure/tenure-track, senior-lecturer and research-faculty lists. He wrote that he and his coauthor had prepared a response "that we hope you will share broadly" and added: "I would be very thankful if you would share with your networks as well." When Jamie asked University officials why a professor was permitted to use the University's website as a platform for falsehoods about its own employee, she was told only that it was "free speech."

52. The piece remains on Defendant's website. Defendant updated the page on November 19, 2024, and formally refused Jamie's written request for removal on September 8, 2025.

53. On April 21, 2023, after an eight-week internal review, Defendant publicly characterized Jamie's allegations as unsubstantiated. Yet the same report concluded that a more detailed and formalized approach to documenting parental consent and custody was warranted; announced that Defendant would require specific written consent before prescribing sex rejecting medications and custody agreements before a minor's initial visit; and established weekly oversight including additional education on consent and adverse-event reporting. The report also identified six cosmetic double mastectomies performed by Defendant's physicians on

children since 2018. Although Defendant characterized those surgeries as outside or self-referrals, it acknowledged that Center providers supplied families with surgeons' names and provided summaries of care to surgeons.

54. Jamie's sworn affidavit moved the treatment of gender-dysphoric minors out of the clinic and before state authorities and the public square, transforming a closely-held medical practice into a matter of urgent statewide concern. In the months that followed, that scrutiny helped galvanize legislative support for Missouri's SAFE Act, which the General Assembly passed on May 10, 2023, and which the Governor signed into law on June 7, 2023. The Act prohibits prescribing puberty blockers and cross-sex hormones to and performing surgeries on minors for purposes of gender transition, codifying the very concerns Jamie first brought to light.

***Jamie is harassed by her co-workers and Defendant does nothing.***

55. Before her whistleblowing activity, during her first two months with the Pediatric Hematology and Oncology Department, Jamie's work was considered exemplary and her colleagues were cordial and treated her with respect.

56. This changed after her unveiling as the whistleblower.

57. Jamie's colleagues in the Pediatric Hematology and Oncology department retaliated against her whistleblowing almost immediately. They quickly became aggressively hostile to Jamie in a non-verbal way. For example, one of Jamie's team leads added a large trans flag to her video-conferencing background during team calls. Another colleague began displaying a handmade sign stating that

"pediatric gender care saves kids' lives" as the colleague's background. In addition, Jamie's colleagues began hanging transgender flags in the office and in many of their cubicles when no such signage or flags had been displayed before.

58. Similarly, one or more of Jamie's colleagues strung a large "daisy chain" banner—covered with signed testimonials from former clients of the Center, saying things like "the Pediatric Transgender Center saved my life"—from the ceiling throughout the cubicle area. The banner appeared only on Jamie's floor of the building. It began near the entrance to the office, and ran the length of the floor, terminating at Jamie's cubicle. The display had nothing to do with the work Jamie and her colleagues actually performed and was removed only after Jamie lodged a formal complaint with Human Resources.

59. When Jamie told her supervisors that these entirely new, targeted, and retaliatory displays were unprofessional, her supervisors responded that the flags and signs were permitted and that they would continue to allow them.

60. In or about February 2024, Jamie was excluded from the team's vacation-coverage emails—the mechanism by which colleagues arranged to cover one another's recurring duties—so that she could neither offer coverage to others nor reasonably request it for herself. During a wider team meeting about vacation coverage, Jamie told her supervisor, Sally Jones, that coworkers were excluding her from those emails as part of their systematic ostracization campaign against her.

61. Jones declined to direct the team to include Jamie. Instead, Jones told Jamie that the exclusion was Jamie's fault because she had not cultivated the

relationships necessary to be trusted by her team and that it was Jamie's responsibility to develop relationships that would lead coworkers to include her.

62. Jamie's colleagues also began refusing to cover for Jamie when she was due to be out on a vacation day. Before Jamie's whistleblowing, arranging coverage for recurring daily tasks was routine and required nothing more than a request, which co-workers willingly accommodated. Because Jamie could no longer secure coverage, in or around February 2024 she had to log into Defendant's network from home while on vacation to complete that day's required tasks. Despite these extraordinary efforts to serve patients in the face of openly hostile co-workers who refused to cover for her, Defendant's managers reprimanded her for logging on from an offsite location. Thereafter, Jamie was effectively unable to take vacation days.

***Jamie was harassed across Defendant's campus and Defendant does nothing.***

63. The harassment was not limited to Jamie's immediate work colleagues. On at least one occasion, a barista at Defendant's campus coffee shop—accessible only to, and staffed by, Defendant's employees—refused to serve Jamie, stating that they knew who she was.

64. On November 17, 2023, Jamie—who is a lesbian and a continuing member of OutMed, the organization Defendant created for LGBTQIA+ faculty, trainees, students, and staff of its School of Medicine—attended an OutMed Pride Week lecture on the surgical provision of transition-related interventions. She had pre-registered for the event and badge-scanned to enter, so her attendance was both anticipated and documented. During the lecture, the individual running the event

confronted Jamie, told her that he knew who she was, and directed her to leave; she was removed from the auditorium in front of the entire audience. The hostility extended beyond Defendant's campus as well: Jamie was refused registration at a professional conference in Indianapolis, which refunded her ticket purchase rather than permit her to attend.

65. On July 4, 2023, Jamie publicly identified herself as the whistleblower to the Missouri Attorney General.

66. On August 23, 2023, the New York Times published an article identifying Jamie as the whistleblower and reporting on her concerns about the Center. Jamie then posted to X, sharing a photo of the cover page of the article, on August 26, 2023.

67. In September 2023, Jamie received an internal letter circulated to Defendant's employees. The letter criticized the Center for complying with Missouri law by finally ceasing to prescribe puberty blockers and opposite-sex hormones to transgender-identifying minors. The letter attempted to collect signatures from university employees. On September 19, 2023, Jamie posted to X about that internal letter.

***Jamie is constructively discharged.***

68. In April 1, 2024, Jamie sent Human Resources a formal letter reporting what she described as a "very difficult and hostile work environment" and giving notice of her resignation. The letter identified, among other things, Dr. Goldbach's attack on her credentials; the flags, posters, and flower banner displayed after her

whistleblowing; her coworkers' isolation of her; her removal from the November 17, 2023 OutMed event; and Jones's response to the vacation-coverage exclusion. Her working conditions having become so intolerable that a reasonable person in Jamie's position would feel compelled to resign, Jamie notified Defendant: "At this time I can no longer continue in my role at Washington University School of Medicine. This letter should serve as my formal notice."

69. Defendant's vindictiveness remained unsated. Although Jamie was initially told she could work through the standard 30-day notice period, that offer was immediately rescinded; her work computer was demanded back at once, cutting off access to her professional materials and her own prior research files, which she has been unable to recover. Her health insurance was terminated within the 30-day notice period—before it would otherwise have lapsed—and she was not provided the COBRA continuation information required by federal law. And although Jamie is a Washington University alumna entitled to a lifetime alumni email address, that standard benefit was withheld from her.

70. As a direct and proximate result of Defendant's retaliation and constructive discharge, Jamie has suffered substantial pecuniary and non-pecuniary harm, including lost wages and benefits; the loss of her career and professional identity, having been unable to obtain employment commensurate with her qualifications and reduced to working as a lifeguard; the depletion of her retirement savings and her children's college fund; reputational harm; severe and sustained

emotional distress; the loss of access to medical and mental-health care; and profound disruption to her family, community, and personal life.

71. The Center ceased operating its pediatric program in 2024. Defendant publicly attributed the wind-down to Missouri's SAFE Act, but scheduling records later obtained by the Missouri Attorney General showed that the Center continued scheduling minors after the Act took effect.

72. Those records show that Dr. Lewis, Dr. Garwood and Casey Lofquest continued scheduling both returning and new minor patients from at least February through May 2024.

73. In March 2024, in the course of her Hematology-Oncology duties, Jamie discovered that the Center was still scheduling new minor patients. On April 11, 2024 she submitted supplemental documentation to the Attorney General.

74. The Center's effective closure in July 2024 in fact coincided with the departure of its primary physician, Dr. Lewis, who left for Colorado to continue practicing pediatric gender medicine, and with Defendant's inability to sustain the program under the legal and public scrutiny that Jamie's whistleblowing had set in motion.

**FIRST CLAIM FOR RELIEF**
**RETALIATION IN VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3730(h)**

75. Jamie re-alleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

76. The anti-retaliation provision of the federal False Claims Act provides, in relevant part, that "Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h).

77. The Eighth Circuit has set forth four elements of a retaliation claim under the False Claims Act: "(1) the plaintiff was engaged in conduct protected by the FCA; (2) the plaintiff's employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the plaintiff's protected activity." *Schuhardt v. Washington Univ.*, 390 F.3d 563, 566 (8th Cir. 2004).

78. Regarding the first element, the Eighth Circuit has explained that "[a]n employee engages in activity protected under the [False Claims] Act if the employee undertakes acts in furtherance of a False Claims Act suit and if the employee believes, and has reason to believe, that his or her employer might be committing fraud against the government." *Green v. City of St. Louis, Mo.*, 507 F.3d 662, 667 (8th

Cir. 2007) (citing *Schuhardt*, 390 F.3d at 567). In particular, "[t]he False Claims Act imposes liability for knowingly presenting false or fraudulent claims to the government for payment or approval." *Id.* at 667 (citing 31 U.S.C. § 3729).

79. Jamie was an employee of Defendant when she reported Defendant's violations of the FCA to the Missouri Attorney General.

80. Jamie engaged in conduct protected by the FCA: she reasonably believed, based on her firsthand observations at the Center, that Defendant was submitting false or fraudulent claims to publicly funded insurance programs, including Missouri's Medicaid program, and she reported those concerns to the Missouri Attorney General's Office by letter on January 26, 2023 and by sworn affidavit on February 7, 2023. Missouri's Medicaid program is federally funded, and the conduct Jamie reported therefore falls within the protection of the FCA.

81. Defendant was aware of Jamie's protected activity, which was publicly known and acknowledged by Jamie's supervisors. Additionally, the Missouri Attorney General's Office initiated a multi-agency investigation of the Center's conduct, including its practice of submitting fraudulent insurance claims to Missouri's Medicaid program, and credited Jamie as the whistleblower whose information provided the basis for the investigation.

82. Defendant retaliated against Jamie solely because of Jamie's whistleblowing activity. While she was viewed as a valued co-worker and "team player" prior to her whistleblowing activity's becoming public, Defendant and its employees subjected her to aggressive ostracization and constant harassment when

they learned of her protected report to the Missouri Attorney General. When she complained about her treatment, her managers refused to address the matter. Further, Defendant allowed another professor to maliciously defame Jamie using Defendant's official website.

83. Jamie suffered damages because of Defendant's unlawful retaliatory actions which resulted in her constructive discharge, loss of future employment opportunities, lost wages and benefits, and medically significant emotional distress.

**SECOND CLAIM FOR RELIEF**
**RETALIATION IN VIOLATION OF THE MISSOURI HEALTH CARE FRAUD WHISTLEBLOWER PROTECTION ACT**

84. Jamie re-alleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

85. The anti-retaliation provision of the Missouri Health Care Fraud Whistleblower Protection Act provides that "[a]n employer shall not discharge, demote, suspend, threaten, harass, or otherwise discriminate against an employee in the terms and conditions of employment because the employee initiates, assists in, or participates in a proceeding or court action under sections 191.900 to 191.910." Mo. Rev. Stat. § 191.908.1.

86. Section 191.905.1 provides that "no health care provider shall knowingly make or cause to be made a false statement or false representation of a material fact in order to receive a health care payment."

87. Jamie was Defendant's employee.

88. Defendant, through the Center, was at all relevant times a health care provider.

89. The Eastern District of Missouri has held that an employee "report[ing] facts believed to be health care fraud taken by [an employer] to the Missouri Attorney General hotline" is "initiat[ing] or assist[ing] an investigation into the suspected violation." *Dopplick v. Ortheco LLC*, No. 422CV1208, 2023 WL 6141672, at *7 (E.D. Mo. Sept. 20, 2023).

90. Jamie initiated, assisted in, and participated in a proceeding covered by the statute by reporting to the Missouri Attorney General's Office facts that she reasonably believed showed health-care fraud by Defendant.

91. Defendant was aware of Jamie's protected conduct.

92. Defendant discriminated against, harassed, permitted others to harass and ultimately constructively discharged Jamie because she initiated and participated in the Missouri Attorney General's investigation of the fraudulent billing practices taking place at the Center.

93. Jamie suffered damages because of Defendant's unlawful retaliatory actions which resulted in her constructive discharge, loss of future employment opportunities, lost wages and benefits, and medically significant emotional distress.

## THIRD CLAIM FOR RELIEF
## RETALIATION IN VIOLATION OF MISSOURI WHISTLEBLOWER'S PROTECTION ACT

94. Jamie re-alleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

95. In Missouri, "[a]n at-will employee may not be terminated . . . for reporting wrongdoing or violations of law to superiors or public authorities." *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 92 (Mo. 2010). The Missouri Supreme Court adopted that rule in 2010 as a public policy exception to the at-will employment doctrine. *Id.*

96. In 2017, this public policy exception was codified by the Missouri legislature in its Whistleblower's Protection Act ("MWPA"). *See* Mo. Ann. Stat. § 285.575(3). Under the MWPA, a "Protected person" includes "an employee of an employer who has reported to the proper authorities an unlawful act of his or her employer." *Id.* § 285.575(2)(4).[3]

97. Defendant is an "employer" as defined by the MWPA.

98. Jamie, as Defendant's employee, is a protected person under the MWPA.

99. Constructive discharge qualifies as wrongful discharge where an employer "deliberately renders the employee's working conditions intolerable and thus forces him to quit his job." *Bell v. Dynamite Foods*, 969 S.W.2d 847, 853 (Mo. Ct. App. 1998), *abrogated on other grounds by Fleshner v. Pepose Vision Inst., P.C.*, 304

[3] To the extent the claims in Counts I and II qualify as an applicable "statutory or regulatory scheme under Mo. Ann. Stat. § 285.575(5), then the claim in Count III is brought in the alternative.

S.W.3d 81 (Mo. 2010) (cleaned up). The relevant standard is whether "a reasonable person would find his working conditions intolerable." *Id.*

100. Jamie reported Defendant's wrongdoing to the Missouri Attorney General's Office, which led to a multi-agency investigation of the Center, including violations of the MMPA, Mo. Rev. Stat. § 407.020.

101. This claim rests on retaliation for Jamie's reporting of misleading representations to parents about treatment risks and reversibility.

102. Defendant, a corporate entity doing business in Missouri, purposefully made Jamie's working conditions intolerable in retaliation for her reporting Defendant's wrongdoing to the Missouri Attorney General's Office.

103. A reasonable person would have found Jamie's working conditions intolerable.

104. The intolerable working conditions caused Jamie to quit her job with Defendant and therefore, Jamie was constructively discharged from her position with Defendant.

105. Jamie's constructive discharge in retaliation for her reporting Defendant's wrongdoing was wrongful.

106. Jamie suffered damages because of Defendant's unlawful retaliatory actions which resulted in her constructive discharge, loss of future employment opportunities, lost wages and benefits, and emotional distress.

107. Defendant's conduct "was outrageous" and due to Defendant's "evil motive or reckless indifference to [Jamie's] rights." Thus, Jamie is entitled to liquidated damages under Mo. Ann. Stat. § 285.575(7)(3).

**FOURTH CLAIM FOR RELIEF**
**FAILURE TO PROVIDE COBRA CONTINUATION COVERAGE NOTICE IN VIOLATION OF ERISA, 29 U.S.C. §§ 1132(a)(1)(A), (c)(1), 1166(a)(4)**

108. Jamie re-alleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

109. Under COBRA, as incorporated into ERISA, the sponsor of a group health plan must provide each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event the opportunity to elect continuation coverage under the plan. 29 U.S.C. § 1161(a).

110. The Plan is subject to COBRA's continuation-coverage requirements. It is a group health plan, 29 U.S.C. § 1167(1); it is neither a governmental plan nor a church plan, *id.* § 1003(b)(1)–(2); and Defendant normally employed far more than 20 employees on a typical business day during 2023, the calendar year preceding Jamie's qualifying event. *Id.* § 1161(b).

111. Jamie was a covered employee under the Plan, 29 U.S.C. § 1167(2), and a qualified beneficiary, id. § 1167(3)(B). Jamie's spouse and children, who were covered under the Plan on the day before the qualifying event as Jamie's spouse and dependent children, were also qualified beneficiaries. *Id.* § 1167(3)(A).

112. The termination of Jamie's employment, which was not by reason of gross misconduct, was a qualifying event because it resulted in the loss of her

coverage under the Plan. 29 U.S.C. § 1163(2). That qualifying event entitled Jamie to elect up to 18 months of continuation coverage. Id. § 1162(2)(A)(i).

113. When a qualifying event is the termination of a covered employee's employment, the employer must notify the plan administrator within 30 days, 29 U.S.C. § 1166(a)(2), and the administrator must then notify each qualified beneficiary of the right to elect continuation coverage within 14 days, id. § 1166(a)(4)(A), (c). Where, as here, the employer is also the plan administrator, it must provide the election notice no later than 44 days after the qualifying event or, if the plan so provides, after the loss of coverage. 29 C.F.R. § 2590.606-4(b)(2). The notice must contain the information specified in 29 C.F.R. § 2590.606-4(b)(4), including how to elect continuation coverage, the deadline for doing so, and the cost of coverage.

114. Defendant failed to provide Jamie and her covered family members with the required election notice within 44 days of the qualifying event in April 2024, and has never provided it. Defendant, therefore, failed to meet the requirements of 29 U.S.C. § 1166(a)(4).

115. An administrator "who fails to meet the requirements of paragraph (1) or (4) of section 1166 . . . with respect to a participant or beneficiary . . . may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper." 29 U.S.C. § 1132(c)(1). For violations occurring after July 29, 1997, the maximum daily penalty is $110. 29 C.F.R.

§ 2575.502c-1. A participant or beneficiary may bring a civil action "for the relief provided for in subsection (c)." 29 U.S.C. § 1132(a)(1)(A).

116. Defendant's failure was willful and in bad faith. Defendant, which controlled both Jamie's employment and the Plan, knew of the qualifying event, and it withheld the election notice as part of a deliberate course of retaliation against Jamie for her protected whistleblowing activity.

117. Jamie was prejudiced by Defendant's failure. Without the notice, she lost the opportunity to elect up to 18 months of continuation coverage, was left without health insurance and lost access to medical and mental-health care.

118. Defendant is liable to Jamie for statutory penalties of up to $110 per day from the date of its failure until the date it provides the required notice, together with such other relief as the Court deems proper, including reimbursement of medical expenses Jamie incurred that the Plan would have covered. 29 U.S.C. § 1132(c)(1).

119. Jamie also seeks her reasonable attorneys' fees and costs on this claim. 29 U.S.C. § 1132(g)(1).

## PRAYER FOR RELIEF

WHEREFORE, Jamie prays for relief as follows:

1. Preliminary and permanent injunctive relief requiring Defendant to reinstate Jamie to her prior position with no loss of pay or benefits;

2. A judgment declaring that Defendant's retaliation against Jamie was unlawful and in violation of federal and state law as well as Missouri's public policy;

3. Compensatory damages, including but not limited to loss of pay from the date of termination to the date of reinstatement, in an amount to be determined at trial, as well as any statutory and punitive damages;

4. Front pay in lieu of reinstatement;

5. On the Fourth Claim for Relief, statutory penalties under 29 U.S.C. § 1132(c)(1) and 29 C.F.R. § 2575.502c-1 of up to $110 per day from the date Defendant failed to provide timely notice until the date Defendant provides the required COBRA election notice, together with such other relief as the Court deems proper, including reimbursement of medical expenses Jamie incurred that the Plan would have covered;

6. Emotional distress damages and any other special or non-economic damages, in an amount to be determined at trial;

7. Reasonable attorneys' fees and costs, including as provided by 31 U.S.C. § 3730(h)(2), Mo. Rev. Stat. § 285.575, and 29 U.S.C. § 1132(g)(1); and

8. Such other and further relief as the Court may deem just and proper.

Plaintiff demands a trial by jury.

Respectfully submitted,

*/s/ Michael Martinich-Sauter*
Michael Martinich-Sauter, #66065MO
James Otis Law Group, LLC
530 Maryville Centre Drive, Suite 230
St. Louis, Missouri 63141
(314) 949-3018
Michael.Martinich-Sauter@james-otis.com

Marcella Burke*
Patrick Kenneally*
Burke Group
1000 Main St., Suite 2300
Houston, Texas 77002
T: (832) 987-2214
F: (832) 793-0045
marcella@burkegroup.law

Gene C. Schaerr*
Edward H. Trent*
Stephanie L. Freudenberg*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
etrent@schaerr-jaffe.com
sfreudenberg@schaerr-jaffe.com

* Applications for Admission pro hac vice forthcoming

*Counsel for Plaintiff*

Dated: November 3, 2026